**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

JOHN H. STEVENS,

    Plaintiff,

    v.

CHARLES COUNTY, MARYLAND and
MARK BELTON,

    Defendants.

Civil Action No. TDC-20-3522

**MEMORANDUM OPINION**

Plaintiff John H. Stevens has filed this civil action against Defendants Charles County, Maryland ("the County") and County Administrator Mark Belton in which he has alleged that he was subjected to race discrimination in employment and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), and 42 U.S.C. § 1981. Pending before the Court is Defendants' Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

**BACKGROUND**

Stevens, who is a Black, has worked for Charles County since 2006. Stevens started out as a Project Manager for water and sewer projects, including as a team leader, then served as the Program Manager for water and sewer. In approximately 2010, Stevens was promoted to his current position as Chief of the Capital Services Division. The Capital Services Division had two sections: the transportation section and the water and sewer section.

## I.    Reorganization

Until 2018, the Capital Services Division was part of the Department of Planning and Growth Management. At that time, the County Administrator, Michael Mallinoff, transferred it to the Department of Public Works ("DPW"). In the same time frame, the water and sewer section was removed from Stevens's supervision. Despite the reorganization, Stevens's title, grade, and salary remained the same.

On January 11, 2019, Mallinoff resigned from his position as County Administrator. The next day, Stevens became the Acting County Administrator and served in the role until February 4, 2019. As Acting County Administrator, Stevens reversed Mallinoff's decision to place the Capital Services Division under the DPW and established it as a freestanding division on an interim basis.

In February 2019, Defendant Mark Belton was appointed as the County Administrator. Belton had previously served as the County Administrator between December 2012 and December 2014. Early in his new tenure, Belton spoke with Stevens about the interim reorganization relating to the Capital Services Division and advised that he would observe it and give it time to play out, but on February 5, 2020 Belton reinstated Mallinoff's full reorganization, resulting in five employees again being removed from Stevens's supervision.

## II.   Employee Complaint

Meanwhile, on February 22, 2019, soon after Belton became the County Administrator, Jen Harris, the County's Chief of Media Relations, knocked on Belton's office door, handed him a memorandum that she had drafted, and described an encounter that she had had with Stevens. In the memorandum, Harris stated that on Monday, January 14, 2019, she had sought a short meeting with Stevens to discuss a work matter. After discussing the work issue, Stevens "leaned back in

2

his chair and asked [Harris] what perfume [she] was wearing, because he really liked the smell of it and might want to go out to buy it for his wife." Joint Record ("J.R.") 230, ECF No. 37. Harris "was taken aback and thought it was an inappropriate comment to make." *Id.* Harris informed Stevens that she does not wear perfume because she is allergic, to which Stevens responded, "[W]ell maybe it's your hairspray or something else, because you smell good." *Id.* Harris repeated that she was not sure what the smell was but that it was not perfume. After leaving Stevens's office, Harris immediately shared the conversation with Megan Donnick, the Acting Director of Human Resources, and told Donnick that she would document the incident, and that if it happened again, she would file a complaint.

After receiving this information, Belton sought to understand what Harris wanted to be done about the issue. Harris told Belton that she had handled the incident herself and did not think that the County needed to take any action, but she wanted Belton to be aware of it and wanted there to be documentation of the incident. After speaking with the Human Resources Department ("HR") and the County Attorney, Belton decided that he would discuss it as part of Stevens's next performance evaluation. Stevens does not deny the allegations made by Harris.

**III.    Potential Promotion**

After Belton became County Administrator in February 2019, he had one-on-one meetings with each of the County Commissioners. In a conversation that month, Commissioner Thomasina Coates suggested several personnel changes, including that she thought very highly of Stevens and would like to see him promoted to be a department head or Deputy County Administrator. In a separate conversation about two or three months later, Commissioners Reuben Collins and Bobby Rucci told Belton that they had sufficient votes on the Board of County Commissioners to make

3

certain personnel changes and suggested removing the Director of Planning and Growth Management and promoting Stevens to replace him.

In the conversation with Commissioners Collins and Rucci, Belton stated that he disagreed with the suggestion because he did not believe Stevens should be promoted to be the director of a division in which he was not presently serving, and that if there were an opening, he would conduct an open search and fill the position with the most qualified candidate. Belton reminded the Commissioners that he has the right to hire and fire staff, so it was out of their purview to suggest staff changes or to vote on such changes with the other Commissioners. Belton also informed the Commissioners about the memorandum from Harris, of which the Commissioners were not previously aware, as another reason he was not supportive of their proposal to promote Stevens. After Belton referenced the memorandum, the Commissioners did not push the conversation any further.

Later in 2019, the Director of Planning and Growth Management voluntarily resigned. The County then held an open search for the new director, and Belton has asserted that he hired the best qualified candidate. Stevens did not apply for the position. In his deposition on June 30, 2021, Stevens stated that he did not apply for the Director of Planning and Growth Management position because the Capital Services Division, of which he had been the chief, was not part of that department and thus would not have been under him in that role. Stevens also stated in his deposition that he never applied to be either the County Administrator or the Deputy County Administrator, citing "no specific reason." J.R. 37.

However, in a December 22, 2021 declaration submitted in opposition to the Motion, Stevens stated that Commissioner Coates told him that Belton would never promote him to a higher position. He also asserted that Crystal Hunt, the Chief of Staff to Commissioner Collins, told him

4

that Commissioner Collins had told her that Belton disagreed with promoting Stevens because it would not look good to women.  Based on these conversations, Stevens asserted that he "thought it would be a waste of time to apply for any promotion."  J.R. 329.  Stevens has not applied for any vacant positions since Belton became the County Administrator.

## IV.   Performance Evaluation

On February 18, 2020, Belton presented Stevens with his performance evaluation for 2019. Although it was not typical for the County Administrator to conduct the performance evaluation for the Chief of the Capital Services Division, Belton did so in part because Stevens had served as Acting County Administrator during part of the evaluation period.  In the evaluation, Stevens received a score of two out of five for "teamwork," in part because Belton concluded that his decision to reverse the Mallinoff reorganization was to advantage the Capital Services Division of which he was the chief.  J.R. 177.

Stevens also received a score of two out of five for the trait "respect."  J.R. 176.  When Belton and Alexis Blackwell, the County's Human Resources Director, presented the performance evaluation to Stevens, they told him that he would receive a memorandum explaining the low grade in this category as based on some inappropriate statements or behavior by Stevens.

On February 26, 2020, Stevens sent Blackwell an email with the subject line "Notification of Complaints."  J.R. 241.  In the email, he requested that the message serve as a formal complaint of race discrimination, excessive abuse of power, defamation of character, harassment, and a hostile work environment spanning numerous years and multiple levels of management.  Stevens requested an investigation into his claims.  Because Stevens had implicated leadership at all levels of the County government as well as in HR, the County retained Bernadette Sargeant, a partner at an independent law firm, to investigate the allegations.

5

Sargeant's investigation lasted several months. Ultimately, Sargeant concluded that Stevens's complaints were unfounded. On July 2, 2020, Belton emailed Blackwell about scheduling a time to debrief Stevens about the results of the investigation. In the same email, Belton also stated that he wanted to follow up and issue the memorandum to Stevens about unwanted comments to female staff members, a reference to the statement at the time of the February 2020 performance evaluation meeting that Stevens would receive an explanation for his low rating on "respect." Sometime after July 2, 2020, Blackwell met with Stevens to inform him of the results of the investigation. On July 28, 2020, Belton emailed Blackwell again to request that the memorandum be finalized and issued to Stevens without a meeting or further delay.

On August 5, 2020, Belton sent the finalized memorandum to Stevens. In a cover email, Belton stated that "when Alexis Blackwell and myself reviewed with you your performance evaluation covering the period April 2018 through December 2019, we rated you as a '1' for the trait value of respect . . . and told you that a memo documenting the issue would be forthcoming." J.R. 194. The memorandum referenced the complaint by Harris and stated that "[t]he employee handled the matter herself and pointedly requested that I take no further action regarding the incident. However, I feel it is important to note this is at-least the third incident of this nature ... accusations of inappropriate and unwelcome comments to female employees...that has occurred during your tenure with Charles County." J.R. 195. The memorandum concluded by stating, "Continued or repeated behavior of this nature could precipitate additional consequences for both you and the County." *Id.* According to Blackwell the memorandum was not considered a disciplinary action because "[t]here are no specific consequences associated with [that] particular action." J.R. 211.

6

According to Belton, the reference to other incidents of inappropriate comments was based on information he learned from HR after his conversation with Harris, which included a written complaint and a verbal complaint. Stevens has acknowledged that one of his subordinates, Claudette Merrick, had filed an EEOC complaint about him that was later dismissed.

After receiving the memorandum, Stevens sent to Belton and Blackwell an email he described as his "Statement of Protest," which he asked to be included in his personnel file with the memorandum. J.R. 196–97. Blackwell responded that the email would be included as requested. On September 8, 2020, Stevens filed a formal grievance with HR about the memorandum. On September 23, 2020, Blackwell issued a memorandum to Stevens rejecting the grievance as untimely based on the terms of the Informal Grievance Procedure set forth in the County's Personnel Policy and Procedures Manual, which state that an "informal grievance must be presented in writing with ten (10) working days after the occurrence which [led] to the grievance," and that "[a] grievance may be rejected. . . if the grievance is not presented within the ten (10) day time limit." J.R. 198. Pursuant to the relevant procedures, had the grievance been accepted, the County would have scheduled a hearing at which Stevens could have sought  the withdrawal of the memorandum from his personnel file.

## V.     Procedural History

On December 3, 2020, Stevens filed a timely Complaint in this Court. In his Complaint, Stevens asserted causes of action under Title VII against the County for race discrimination (Count 1), a hostile work environment (Count 2), and retaliation (Count 3). He also asserted analogous claims against Belton pursuant to 42 U.S.C. § 1981 for race discrimination (Count 4), a hostile work environment (Count 5), and retaliation (Count 6). On September 17, 2021 the parties filed a joint stipulation dismissing Counts 2 and 5, the hostile work environment claims.

## DISCUSSION

In their Motion for Summary Judgment, Defendants argue that Stevens's remaining claims fail in light of the record evidence. First, they argue that the race discrimination claims fail because none of the actions of which Stevens complains constitute an adverse employment action that could form the basis of an employment discrimination claim, Stevens has not identified evidence that could support the conclusion that any of the adverse actions against him were taken for discriminatory purposes, and Stevens has not provided sufficient evidence to show that the Defendants' proffered legitimate, non-discriminatory reasons for the adverse actions were pretextual. Second, they argue that the retaliation claims fail because the record evidence does not support them. Defendants also argue that Belton is entitled to qualified immunity from the claims against him, and that Stevens is not entitled to the damages that he seeks.

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

8

## II.     Race Discrimination

In their Motion, Defendants argue that Belton has not provided evidence of race discrimination and specifically assert that the adverse actions against him, such as the reversal of the Mallinoff reorganization, do not qualify as adverse employment actions, as necessary to support a Title VII claim.  In responding to the Motion, Stevens asserts that his race discrimination claims are based on the failure to promote him to the position Director of Planning and Growth Management or any other director level job.  Specifically, Stevens focuses on the facts that multiple County Commissioners recommended that he be promoted and that a white woman was promoted instead, and he argues that Belton's reasons for not promoting him were pretextual.  A failure to promote can constitute an adverse employment action.  *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 544 (4th Cir. 2003) ("It has long been clear that failure to promote an employee constitutes an adverse employment action for the purposes of § 2000e–3.").  Because in opposing the Motion Stevens has not asserted that his race discrimination claims are based on any other adverse employment actions, the Court need not address whether the reorganization or other incidents referenced in the Complaint constitute actionable adverse employment actions within the meaning of Title VII.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The statute requires a plaintiff to establish a claim through one of two methods.  As relevant here, the plaintiff may either demonstrate through direct or circumstantial evidence that his membership in a protected class "motivated the employer's adverse employment decision," or

9

the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Under the *McDonnell Douglas* framework, the employee must first establish a *prima facie* case of discrimination. *Hill*, 354 F.3d at 285. If the employee does so successfully, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if such a showing is made, the burden shifts back to the plaintiff to prove "by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.*

Title VII case law applies to § 1981 claims, so the Court evaluates all causes of action under Title VII standards. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 788–89 (D. Md. 2013) (citing *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 n.1 (4th Cir. 2004)); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 483 n.20 (D. Md. 2013) ("Section 1981. . . claims of discrimination are analyzed under the same framework as Title VII.").

Stevens alleges no direct evidence that the failure to promote him was the result of race discrimination. He therefore must establish his case through the *McDonnell Douglas* framework.

### A.   *Prima Facie* **Case**

To establish a *prima facie* case of discriminatory non-promotion under *McDonnell Douglas*, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for the position in question; (3) the plaintiff was qualified for the position; and (4) the plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination, which can include when the position was filled by a person outside the protected class. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). There is no dispute that Stevens

10

is Black and is therefore a member of a protected class, satisfying the first element of the *prima facie* case. There is also no dispute that a white woman was selected to be the Director of Planning and Growth Management, thereby satisfying the fourth element. As for the third element, in their reply brief, Defendants argue that Stevens was not qualified for the position of Director of Planning and Growth Management because he did not meet the stated requirement of having a "Master's degree in Planning, Business Administration, Management, Architecture, Engineering, or a related field," J.R. 472, which Stevens did not have and the hired candidate did have. However, where Stevens has not had the opportunity to respond to this argument, and the record establishes that Stevens had previously been appointed to serve as the Acting County Administrator, a more senior position, and had been recommended for various director positions by multiple County Commissioners, the Court will not conclude at this time that there is no genuine issue of material fact on this element.

Defendants primarily focus on the second element. There is no dispute that Stevens did not apply for the position of Director of Planning and Growth Management or for any other promotion. However, when a plaintiff did not apply for the position in question, the failure to apply can be excused if the other elements of a *prima facie* case are satisfied and there is a showing that the plaintiff "would have applied but for accurate knowledge of an employer's discrimination" and "would have been discriminatorily rejected had [the plaintiff] actually applied." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998). In such a case, plaintiffs need not subject themselves "to the humiliation of explicit and certain rejection"; the unwillingness to engage in the futile gesture of formally applying for the position in question is excused. *United States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir. 1989); *see also Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 366 (1977) (establishing the "futile gesture" doctrine).

11

Stevens argues that his failure to apply can be excused because he believed that it would have been futile. In support of this argument, Stevens relies on his attached declaration, dated December 22, 2021, in which he states that he concluded that applying for a promotion would have been a waste of time based on statements by Commissioner Coates and the Chief of Staff to Commissioner Collins, who had been informed that Belton would not promote him under any circumstances, in part because Belton believed that such a promotion would look bad to women. Defendants, however, argue that this statement should not be considered because it is materially inconsistent with Stevens's deposition testimony: during his June 30, 2021 deposition, Stevens specifically stated that the reason he did not apply for the Director of Planning and Growth Management position was that his division, the Capital Services Division, was in a different department and thus would not be reporting to him if he received that position.

Under the sham affidavit doctrine, an affidavit submitted in opposition to a motion for summary judgment can be considered a "sham" affidavit and disregarded if it is in "such conflict" with the witness's earlier deposition testimony that it is being offered for the purpose of creating a dispute of material fact. *Rohrbough v. Wyeth Lab'ys, Inc.*, 916 F.2d 970, 975–76 (4th Cir. 1990); *see also Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 422 (4th Cir. 2014). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) (citation omitted). The sham affidavit doctrine is a narrow one and applies only when inconsistencies between a party's deposition testimony and a later affidavit are "clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). A party is "not precluded from elaborating upon, explaining or clarifying prior testimony, and minor

12

inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 999.

Here, Stevens's statement in the affidavit recounting conversations that led him to conclude that Belton would not promote him under any circumstances, such that it would be a waste of time to apply for a promotion, is not directly contradicted by Stevens's deposition testimony. It is possible both that Stevens had these conversations and was generally deterred from applying for promotions and that, as he stated in his deposition, the specific reason he did not apply for the Director of Planning and Growth Management position—the only position for which he has specifically alleged a discriminatory non-promotion—was that he was not interested in it because the position would not supervise his longtime division, the Capital Services Division. Even if read together in this manner, however, the record shows that regardless of whether Stevens had the conversations described in the affidavit, he would not have applied for the position in any event, so he has not shown that he "would have applied but for accurate knowledge of an employer's discrimination," as required to apply the futile gesture doctrine. *Brown*, 159 F.3d at 902. To the extent that Stevens is now claiming that the conversations with the commissioners and their staff were the specific reason he did not apply for the Director of Planning and Growth Management position and seeks to disavow his deposition testimony that he had no interest in that specific position anyway, there would be a direct contradiction, and the Court would rely on Stevens's deposition testimony under the sham affidavit doctrine. *See Rohrbough*, 916 F.2d at 975–76. Thus, the Court finds that Stevens has not satisfied the second element of a *prima facie* case.

## B.      Legitimate, Non-Discriminatory Reason and Pretext

Even if Stevens could meet the requirements for a *prima facie* case, his race discrimination claim would still fail because he has not identified evidence sufficient to raise a genuine issue of

material fact on whether Defendants' asserted legitimate non-discriminatory reasons for failing to promote him were pretextual.

As discussed above, if a plaintiff has met the burden to establish a *prima facie* case of a discriminatory failure to promote, the burden shifts to the defendants to show a legitimate, non-discriminatory reason for the promotion decision. *See Hill*, 354 F.3d at 285; *Carter*, 33 F.3d at 458. This burden is "only one of production, not persuasion." *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998). Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-discriminatory reason "for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). If the defendant makes a showing of a legitimate, non-discriminatory reason for the non-selection, the burden then shifts back to the plaintiff to show that the stated reason was a "pretext for discrimination." *Hill*, 354 F.3d at 285.

Defendants reference the Harris complaint as a reason that Stevens would not have been selected. Although Stevens disputes the significance of that complaint, he has not denied that the incident occurred, nor has he shown that a complaint of alleged harassment of a co-worker could not provide a basis for non-selection for a promotion. Because Defendants have identified a legitimate, non-discriminatory reason, Stevens ultimately bears the burden to show by a preponderance of the evidence that this explanation is "pretextual or otherwise unworthy of credence." *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 275 (4th Cir 1995).

Stevens has not met this burden. Stevens asserts that a jury could find that Belton's response to the Harris complaint and subsequent actions were "akin to a fishing expedition" and could "support the position that Defendant Belton was acting with a discriminatory animus in how he chose to deploy the contents of the Harris complaint," Opp'n at 28, ECF No. 33, but he provides

14

no actual evidence that Belton's explanations of his actions were "pretextual or otherwise unworthy of credence." *Henson*, 61 F.3d at 275. Instead of citing to the record, Stevens just argues that a jury could infer that Stevens' comments to Harris were "innocently made. . . albeit perceived by the female county employee as inappropriate," and that a jury could infer that Belton had decided to "weaponize" the complaint because he did not raise it to Stevens until a year later. Opp'n at 27.

Viewing the evidence in the light most favorable to the nonmoving party, the Court finds that such assertions, without more, do not provide sufficient evidence to support the conclusion that the actual reason for Belton's decision not to promote Stevens was based on race discrimination. "Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Even if a plaintiff has established a *prima facie* case and presented evidence that the asserted justification for the action was false, the evidence may still be insufficient to support a finding of liability. *Id.* at 148. Thus, the Court must consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether judgment as a matter of law is appropriate. *Id.* at 148–49.

Here, even if Stevens intended no harm with his comment to Harris, that fact would not preclude a supervisor from taking action in response to the incident or considering it in promotion decisions, particularly to senior leadership positions. More importantly, Stevens has identified no

15

evidence that Belton's handling of the Harris complaint, or his consideration of it in his assessment of whether Stevens should be promoted, was adversely impacted by discriminatory animus. There is no evidence that Belton, or any other County official relevant to this case, has ever said anything derogatory about his race. Although Stevens notes that Belton hired three white women to director positions, the record also reflects that Belton hired three Black persons to serve in other director positions. Thus, even if a jury could view Belton's treatment of the Harris complaint as an overreaction, there is insufficient evidence to support a finding that the true reason for this disparate treatment was discrimination based on race. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (holding that a plaintiff fails to demonstrate pretext where the only evidence of discriminatory intent is the plaintiff's own assertions and subjective beliefs). The Court will therefore grant the Motion as to Stevens's claims of race discrimination.

## III. Retaliation

In Counts 3 and 6, Stevens alleges retaliation in violation of Title VII and 42 U.S.C. § 1981. A retaliation claim may be established through direct or indirect evidence of retaliatory animus or through the burden-shifting framework analogous to the discrimination framework set forth in *McDonnell Douglas*. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Under either approach, the plaintiff must show that the adverse action would not have occurred in the absence of the employer's retaliatory animus, such that retaliation was the "real reason" for the action. *Id.* at 251–52. Stevens has not identified direct evidence of retaliatory motive, so he proceeds under the *McDonnell Douglas* analysis, under which:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

16

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted); *cf. McDonnell Douglas*, 411 U.S. at 802–04.

### A.   *Prima Facie* Case

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). For a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). It need not meet the more stringent definition of an "adverse employment action" required for a discrimination claim. *See id.* at 64 (holding that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment").

Causation in a retaliation claim can be inferred based on the temporal proximity between the protected activity and retaliatory action. *See King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003) (concluding that ten weeks between the protected activity and the materially adverse action "gives rise to a sufficient inference of causation to satisfy the prima facie requirement" but noting that "[t]his length of time ... is sufficiently long so as to weaken significantly the inference of causation between the two events"). A lengthy period of time between a plaintiff's protected activity and the materially adverse action may not be dispositive where the employer retaliates upon its first "opportunity to do so." *See Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011) (finding at the motion to dismiss stage that where the plaintiff alleged that she had resigned shortly after complaining of harassment, a causal connection could plausibly be

inferred despite the passage of time because her re-application two years later presented the first chance for her employer to retaliate). When the time between events is too great to establish causation based solely on temporal proximity, a plaintiff must present "other relevant evidence . . . to establish causation," such as "continuing retaliatory conduct and animus" in the intervening period. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Here, there is no dispute that Stevens engaged in protected activity: he made a formal complaint to the County on February 26, 2020 alleging race discrimination. Stevens asserts that the Defendants took materially adverse actions against him when they issued the August 5, 2020 memorandum relating to the Harris complaint and again when Stevens's grievance was denied as untimely. There is at least a genuine dispute of material fact as to whether the memorandum and the grievance denial are materially adverse actions. Although Blackwell asserted that the memorandum was not a formal disciplinary action, it was placed in Stevens's personnel file and remained there after his grievance was denied. Notably, Commissioner Collins testified that the existence of a sexual harassment complaint in an employee's personnel file would be a factor to consider in whether that person could be selected as County Administrator. Where such a memorandum could impact Stevens's opportunities for promotion, a reasonable jury could find that these actions were materially adverse actions for purposes of the retaliation claim because they would have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68; s*ee Belyakov v. Leavitt*, 308 F. App'x 720, 729 (4th Cir. 2009) (holding that issuing an official reprimand was a materially adverse action for purposes of a retaliation claim because it would dissuade a reasonable worker from making or supporting a charge of discrimination). However, contrary to Stevens's claim, the Court does not find that Belton's actions of forwarding emails to Blackwell to be submitted to Sargeant as part of

18

Sargeant's investigation, rather than sending them directly to Sargeant, was a materially adverse action.

As for causation, Stevens argues that causation is established by the timing of the events because even though the identified incidents occurred approximately six months after his February 2020 discrimination complaint, Defendants retaliated at their first opportunity to do so—once the Sargeant investigation was complete in July 2020. A reasonable jury could agree with Stevens on this point and conclude that the timing of the memorandum was consistent with a retaliatory motivation. The County, however, argues that causation cannot be established because Belton had promised Stevens a written explanation for his low rating on "respect" in his performance evaluation during the evaluation meeting on February 18, 2020, before Stevens filed his discrimination complaint on February 26, 2020. The County relies on *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998), in which it was undisputed that the relevant decisionmaker was unaware that the plaintiff had ever filed a complaint with the EEOC at the time the plaintiff was terminated, thereby preventing any finding of causation. *Id.* at 657. In this instance, the materially adverse action was not completed before the decisionmaker had knowledge of the protected activity, as the content of the memorandum, and the decision to place it in Stevens's permanent file, were not finalized until after the protected activity occurred. Thus, even if the memorandum was contemplated before Stevens filed his discrimination complaint, this fact does not foreclose causation at the *prima facie* case stage.

## B.    Legitimate, Non-Retaliatory Reason

When a *prima facie* case has been established, the burden shifts to the Defendants to show a legitimate, non-retaliatory reason for the adverse action. Defendants have offered evidence that that the memorandum was issued because Belton had promised a written explanation for the low

performance evaluation rating to Stevens at the time of the evaluation meeting in February 2020, and that Belton did so promptly after the completion of the Sargeant investigation because he did not "like things to fester." J.R. 113. As for the denial of the grievance, they argue that the reason for that action was that the grievance was untimely, and the evidence establishes that it was filed 34 days after the receipt of the memorandum, long after the expiration of the 10-day deadline for filing a grievance. They also presented evidence that Stevens knew how to file a grievance properly because he had previously done so. Because, at this stage of the burden-shifting framework, Defendants' burden is "only one of production, not persuasion," *Causey*, 162 F.3d at 800, the Court finds that Defendants have sufficiently advanced legitimate, non-retaliatory reasons.

## C.     Pretext

At the final step in the analysis, the burden shifts back to Stevens to demonstrate that the proffered non-retaliatory reasons were pretextual, and that the true reason for the materially adverse actions was retaliation for Stevens's protected activity. Specifically, Stevens must have presented sufficient evidence to support the conclusion by a preponderance of the evidence that "the purported nonretaliatory reasons were not [the employer's] true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018). Stevens has failed to do so. Stevens could reasonably argue that the decision to address the Harris complaint by giving him a low performance rating on "respect" was not the only or best response to the Harris complaint, and that he deserved an opportunity to respond to the allegations before such an adverse rating was imposed. When he received the memorandum, Stevens fairly objected to the fact that it did not include the specific statements, when they were made, and to whom they were made. However,

20

there is no dispute that Belton had already given Stevens the low performance rating on the "respect" category, that it was based on the Harris complaint, and that he told Stevens that he would receive a written explanation of that low rating at a later date—all before the protected activity. As for the memorandum itself, Stevens does not deny the allegations made by Harris, nor does he deny, as asserted in the memorandum, that there were prior, similar complaints. There is no claim that the memorandum mischaracterized or embellished the allegations, lowered his performance rating any further, imposed any formal discipline, or otherwise went beyond what Belton told Stevens would be discussed in the memorandum. Finally, Stevens has identified no evidence that Belton or other County officials had expressed any negative views on the fact that Stevens had filed a discrimination complaint. Thus, even viewing the evidence in the light most favorable to Stevens, the Court does not find a genuine issue of material fact on whether the stated reason for issuing the memorandum was false or otherwise based on a retaliatory animus.

As for the denial of the grievance, where Stevens does not dispute that it was untimely filed or that he had filed proper grievances in the past, and he has presented no evidence that the County typically accepts and considers untimely grievances, the Court reaches the same conclusion.

Accordingly, the Court concludes that Stevens has provided insufficient evidence of pretext to withstand summary judgment on the retaliation claim. The Court therefore need not address Defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date:  June 30, 2022

THEODORE D. CHUANG
United States District Judge

21